SAMUEL RUSSELL ET AL., Appellants, v. JAMES G. ADKINS ET AL., Respondents.

Kansas City Court of Appeals, February 8, 1887.

1. CHARTER OF KANSAS CITY— POWER TO CONSTRUCT A CULVERT—CONSTRUCTION OF ARTICLE VIII.—Article 8 of the charter of Kansas City (which relates to the grading and paving of streets), provides, by section 7 of said article, that "the work done in constructing any street may be protected from surface water by *temporary* drains and culverts put in under the direction of the city engineer ;" and that the cost of it shall be charged upon the adjoining land, etc. *Held*, that, as an *incident* to the grading and improvement of the street, it was competent for the city to impose upon the *private* land owner the cost of constructing temporary culverts, as a means of protecting the work done in grading and improving the street, from surface water.

2. —— MEANING OF THE WORD "TEMPORARY," AS USED IN THE CHARTER SECTION.—In the nature of the case the word "temporary," as applied to such culverts (in the section under construction), is a relative term. The character of the material and workmanship, the dimensions, and the like, of the temporary culvert, must necessarily depend upon the volume of water likely to seek passage through it, and the probable length of time it must endure the pressure of the water and earth until relieved by the completion of the sewer or other means of escape. And what would answer the purpose of a temporary culvert in one place might be wholly inadequate at a differen*t* place, and under different conditions. But the *discretion* given to the city engineer is not an arbitrary or unbridled one, and it is subject to judicial review and restraint. *Held*, that the *finding* of the court, in this case, that the culvert is a *temporary* work, is supported by the evidence, and this court *defers* to the conclusion reached by that court, in such a case as this.

APPEAL from Jackson Circuit Court, HON. JAMES H. SLOVER, Judge.

*Affirmed.*

*Motion for re-hearing denied.*

The case is stated in the opinion.

Adams & Field, for the appellants.

I.   If the special tax bills in question are void in fact, but yet on their face valid, they are such a cloud upon the title of real estate, as that a court of equity will cancel and remove, as prayed for in plaintiffs' petition.   *Sewell v. St. Paul*, 20 Minn. 511; *Mayor v. Porter*, 18 Md. 284; *Mitchell v. City*, 18 Wis. 92; *Kneeland v. City*, 18 Wis. 411; *Wells v. Burnham*, 20 Wis. 112; *Valle v. Zeigler*, 84 Mo. 214; 75 Mo. 250.

II.   The city had no power to contract for the grading in question and include inseparably therefrom the costly culvert, all at the expense of adjacent property owners.   The power of a city to issue special tax bills and charge private property therewith for the cost of a culvert cannot be admitted from mere conjecture or doubtful inference; it must be plainly and unmistakably conferred, or it cannot be held to have been granted, and any alleged grant of such power is to be strictly, and not liberally, construed.   *Philadelphia v. Greble*, 38 Pa. St. 339; *State v. Shortridge*, 56 Mo. 130; *Wright v. Chicago*, 20 Ill. 252; *City of Fairfield v. Ratcliff*, 20 Iowa, 396; Cooley on Taxation, 209, 210, 418; Burroughs on Taxation, 370-1; Dillon on Mun. Corp. (3 Ed.) sects. 763, 765.

III.   But, conceding that the city had power under article 8 of its charter, to construct temporary drains or culverts during the progress of grading a street, to protect the work from surface water, and charge the cost thereof as a part of the cost of the grading, it cannot be held that article 8 authorizes the construction of a culvert permanent in its character, as is the culvert in question, at the expense of either the city or adjacent property owners, in the discretion of the city engineer, as this character of culvert is especially covered by paragraph eighth, of section 1, of article 3, of the city

charter, and which commits the matter of determining
when and where such culverts shall be established and
erected, to the common council, and not to the city
engineer. *Wright v. Chicago,* 20 Ill. 262.

IV. Though the city had power to contract for the
grading, exclusive of the culvert, at the expense of plain-
tiffs, yet having exceeded its power in contracting also
for the culvert to be paid for, as a part of the cost of
such grading, not separably, but inseparably, from the
cost of the grading, and the whole charged against the
property of plaintiffs in gross in the tax bills in ques-
tion, such tax bills are, therefore, void *in toto.* Dillon
on Mun. Corp. [3 Ed.] sect. 421 and note; *Naltner et al.
v. Blake,* 56 Ind. 127, 131.

V. To make a valid tax bill, the work must be
done under an authorized contract, made and entered
into. It is not sufficient to authorize a special tax bill,
though a valid contract may have been authorized, if,
in fact, only a void one was entered into, and the work
was done thereunder.

VI. But if it could ever be held that the tax bills
in question are valid to the extent of the reasonable cost
of the grading, exclusive of the cost of the culvert in
question, the lien thereof was wholly defeated and de-
stroyed by the *tender* of that amount by plaintiffs to
the holders of the tax bills in question before the insti-
tution of this suit. *Olmstead v. Larsney,* 69 Mo. 396;
*Thornton v. Bank,* 71 Mo. 222, 232; Jones on Mortgages
[3 Ed.] sect. 893.

GEO. F. PUTNAM, for respondent, Freeman.

I. By the provisions of the charter the power is
given to the common council to provide for putting the
streets of Kansas City in suitable shape to be used,
upon proper petition of the property holders. It is
also provided that the cost of the work shall be charged
on the adjoining property, etc. It is also provided
(section 7, article 8, of charter) that the work done in

constructing a street may be protected from surface water by temporary drains or culverts, put in under the direction of the city engineer, etc.

II.   The evidence in this case all goes to show that the culvert, in this case, is a *temporary* one, and such as are necessary for the protection of the work against surface water, and the work was done in strict accordance with an ordinance of the city framed in conformity with the purposes contemplated by the section of the charter before referred to.

III.   This brings us to question, what is meant by the term "temporary culverts" as used in this ordinance? According to Webster, "temporary" means, "existing or continuing for a limited time." This is exactly what the word "temporary" means in this ordinance. It means something in the nature of a culvert that will last, or exist and continue in the shape in which it was built for the limited time it was intended to be used by its builder; which time, according to the undisputed testimony of City Engineer Knight, under whose direction it was built, in this case was, until a public sewer should be built to drain that portion of the city. All culverts which are put in are, according to Mr. Knight's testimony, put in to last until sewers, which are the only permanent system of drainage contemplated by the city charter and ordinances, are completed all over the city upon the plan already begun. The cost of constructing culverts varies with their size and location ; and, the necessity of so large a culvert, is shown by the testimony of all the witnesses upon that point, as to the large quantity of surface water that ran through it every time there happened to be a rain storm. It is shown by the evidence of Mr. Knight and Mr. Donnelly (who, like Mr. Knight, has been city engineer, and is at the present time), that the culvert that was built in this instance was no more expensive than was required in that place ; that a poorer one would not have answered the purpose. The other engineer, put

on the witness stand by the appellants, does not attempt to contradict this; and, in fact, he does not differ from Knight and Donnelly in any thing except he calls this a permanent, and they regard it as a temporary, culvert. It is true there is great difference in the strength of materials; and, equally true that every thing built for temporary use is generally made of as cheap material as will answer the purpose; but, it must answer the purpose, and does not fail to be temporary because it can be used. Neither does it prove there is any such thing as temporary materials.

IV. Again, we say: These appellants are estopped from denying their liability to pay for the building of this culvert. Their petition, as far as appellee is concerned, virtually asks for an injunction to prevent appellees from collecting the tax bills in dispute; and, the time for asking for it was before, and not after the work was done. *Sheenan v. Owens*, 82 Mo. 464.

V. The question whether or not the special tax bills are void on account of a portion of the work for which they are issued as payment being unauthorized, is not an open question in this state. The fact that other work or materials than that called for by the contract may have been apportioned and charged in the bill, will not invalidate it. The amount improperly charged should be deducted from the amount of the bill. *Bank v. Arnoldia*, 63 Mo. 229; *Bank v. Geo. Nelson*, 64 Mo. 418; *Farrar et al. v. St. Louis et al.*, 80 Mo. 393; *Neenan v. Smith*, 60 Mo. 292.

VI. Upon the question of the tender to McIntosh, we say: The position of appellants is inconsistent. They deny that any thing is due; and, then say they tendered us all that was due. The plea of tender admits the existence of the debt. *Mahon et al. v. Waters*, 60 Mo. 168 and cases cited; 2 Greenleaf on Evidence [10 Ed.] sect. 600; 3 Starkie on Evidence [2 Am. Ed.] 1390. And many other authorities. The lien is not de-

feated by the tender, even if the tender was sufficient. The money was never brought into court, as the statute requires. 1 Rev. Stat., p. 187, sects. 1007-8. McIntosh held the tax bills as collateral security for money loaned Strang, the contractor; and had no right either to accept or reject the tender, and he could not bind Strang, the owner of the tax bills. He was not Strang's agent or attorney. A tender must be made to the creditor himself, or, to his agent, servant, or attorney who has authority to receive the money. 2 Greenleaf on Evidence [10 Ed.] 529; 2 Parsons on Contracts [5 Ed.] 639; 2 Parsons on Notes and Bills, 622; *Berthold v. Reyburn et al.*, 37 Mo. 586; *Mahan v. Waters*, 60 Mo. 170; 2 Greenleaf on Evidence [10 Ed.] sect. 606. McIntosh simply held the tax bills as collateral security; and, while he would have accepted the money if offered him to the full amount of the bills and applied it on his debt, he had no authority from Strang to accept any thing less than that; and could not have receipted the tax bills or satisfied the record; both of which it was necessary for him to have authority to do, in order to have been in any way an agent of Strang as the law contemplates. The law does not authorize a tender to be made to an agent who has no interest whatever in the tax bills other than holding them as a mere collateral security upon a debt which he looks to Strang to pay, independently of the tax bills, and, without reference whatever to them; and, the fact that McIntosh testified that if the amount of money offered him had been all that was due on the tax bills, he would have accepted it, did not make him the agent of Strang, and gave him no authority to accept a tender of less than the face of the tax bills, when not specially authorized to do so. *Rogers v. McDermitt*, 7 N. H. P. 506.

PHILIPS, P. J.—This is a petition for an injunction to restrain the defendants from collecting certain special tax bills against the real estate of plaintiffs, on the

ground that the same are illegal, and tend to cast a cloud upon plaintiffs' titles. The tax bills were issued by Kansas City for certain work done in grading Summit street in said city, and putting a culvert therein. The *gravamen* of the complaint is, that the tax bills include, unlawfully, the expense of constructing a culvert in said street, incident to the grading.

The court dismissed the bill; and the plaintiffs prosecute this appeal.

Two principal questions are presented for determination: (1) As to the power of the city to construct a culvert, as an incident to the grading and improvement of its streets, at the expense of private property owners; and, (2) if such power exists, was the culvert in question of the character authorized by the charter to be built at the expense of the private property owner?

I. It is conceded that municipal corporations in the exercise of the taxing power, incident to city improvements, can impose such special tax only under express authority therefor. Any reasonable doubt as to the existence of such power must be solved in favor of the private citizen.

Article 8, of the charter in question, contains the following provisions:

"Section 1. The common council shall have power to cause to be graded, constructed, re-construct, paved, or otherwise improved and repaired, all streets, sidewalks, alleys and public highways or parts thereof, within the city, at such time, to such extent, and of such dimensions, and with such materials, and in such manner and under such regulations as shall be provided by ordinance; and all ordinances and contracts for such work shall specify how the work shall be paid for; and, in case payment is to be made in special tax bills, the city shall in no event, nor in any manner whatever be liable for or on account of the work. Provided, however, that no street, avenue, alley, or public highway or any part thereof shall be

graded, constructed, re-constructed, paved or macada-
mized at the expense of the property holders owning
the property fronting on such street, avenue, alley or
public highway, unless a majority of the real estate
owners in front feet on such street, avenue, alley or
public highway, or the part thereof proposed to be
graded, constructed, re-constructed, paved or macada-
mized, and are residents of the City of Kansas, shall
petition the common council to have such street, avenue,
alley or public highway graded, constructed, re-con-
structed, paved or macadamized."

"Section 2. The cost of all work mentioned in the
last section, except as otherwise provided in this article,
shall be apportioned and paid as follows, namely: The
cost of all work on any sidewalk including curbing and
guttering, along side thereof, and of all work on any
alley shall be charged as a special tax upon the adjoin-
ing land according to the frontage thereof on the side-
walk or alley; the cost of all work on streets, avenues
and highways, or any part thereof, except as last afore-
said, shall be charged as a special tax on the land on
both sides of and adjoining the street, avenue or high-
way, or any part thereof, except, however, that the
cost of grading any street, avenue or highway exclusive
of the grading of the sidewalks thereon, shall be charged
as a special tax on all the property on both sides of
such street, avenue or highway, or part thereof, graded
within the following limits, namely: *  *  *"

Section 7, *inter alia*, provides, that: "The work
done in constructing, partially or wholly, any street or
avenue, may be protected from surface water by tem-
porary drains or culverts put in under the direction of
the city engineer, or other officer in charge or superin-
tending the work, or otherwise, as provided by ordi-
nance; and the same may be closed, removed, or
altered at will, and the city shall not be liable for dam-
age resulting to private property from insufficiency or

want of repair of such drains or culverts, or in respect thereof in any way  *  *  *."

Section 8 provides how such improvement shall be petitioned for by the property owners, ordered, etc.

I am unable to give consent to the proposition contended for by the learned counsel for appellants, that inasmuch as the power to construct temporary culverts is especially named in said section 7, it excludes the idea that such power was intended by the general language of the preceding sections, and that the sole object of the provision in said section 7 was to relieve the city from the burden of keeping open and in repair such work after it had been constructed at the public expense.

The first section in general terms confers the power on the city to cause to be graded, or otherwise improved, the streets and alleys and public highways. It expressly authorizes the council to so grade and improve "to such extent, and of such dimensions, and with such material, and in such manner, and under such regulations, as shall be provided by ordinance; and all ordinances and contracts shall specify how such work shall be paid for."

Section 2 provides for the apportionment of the tax among the property owners. Section 7 follows this up with details, by directing that "the work done in constructing any street may be protected from surface water by temporary drains and culverts, put in under the direction of the engineer." The succeeding clause of this section, providing for tax bills against the city, payable out of the general fund, where the city owns in fee lots or parcels of lands liable for work, clearly enough indicates the purpose to carry into specific detail the manner and extent of such improvements.

The sections must be taken together as consecutive parts of the entire scheme.

It is clear that, as an incident to the grading and improvement of the streets, it was competent for the

city to impose upon the private land owner the cost of constructing temporary culverts, as a means of protecting the work done in grading and improving the street "from surface water." The council, section 29, chapter 31 of Revised Ordinances, provided as follows: "The work done in constructing any street or avenue in whole or in part, may be protected from surface water by temporary drains or culverts put in under the directions of the city engineer at such places, at such time, of such materials and dimensions as he may deem best; and the plan and specifications for grading and other work, shall, as far as practicable, provide for such drains or culverts. The cost of the same, and of all such drains and culverts put in under the direction of the city engineer, shall be deemed a part of the cost of the work done under the particular ordinance and contract in the case, and be paid for accordingly." This ordinance was as specific in its details as was practicable, in its general application.

II. Section 7 provides for the construction only of *temporary* culverts. The remaining question, therefore, is, was this culvert temporary or permanent in its character? If it was not a temporary culvert the city had no power to subject plaintiffs' property to its payment, by special tax bills. The city could not, under the guise of building a temporary culvert, cast upon the private citizen the burden of constructing a permanent work. It is obvious, from the scheme of the charter, as well as the evidence at the trial, that it was contemplated the city would construct ultimately a system of sewers for the drainage of surface water. And as, in the opening and grading of its streets, the work would be exposed to the effects of floods from surface water, as an incident to such improvements in providing against injury to and the destruction of the works by surface water, the burden should be laid upon the adjacent property owners of constructing culverts and drains, of a

temporary character, until the city should provide a permanent sewer or drain.

In the very nature and necessities of the case, the word "temporary," as applied to such culverts, is a relative term. It must be understood, and extended in its application to the given place, and with a reasonable regard to the probable time when a permanent sewer will be constructed in that locality. The character of the material and workmanship, the dimensions, and the like, of the temporary culvert, must, necessarily, depend upon the volume of water likely to seek passage through it, and the probable length of time it must endure the pressure of water and earth until relieved by the completion of the sewer, or other means of escape.

What would answer the purpose of a temporary culvert in 'one place might be wholly inadequate at a different place, and under different conditions. The structure, for the time being, is to be built to answer the object—the protection of "the work done from surface water."

The impracticability of prescribing, by arbitrary enactment, the material and workmanship, and dimensions, for every temporary culvert, adapted to varying circumstances and conditions, was, no doubt, the occasion of the provision that such culverts should be put in under the directions of the engineer, leaving the material and manner of construction to his discretion and judgment. Of course, this discretion is not an arbitrary, or unbridled, one. It is subject to judicial review and restraint; and the courts, for the proper protection of the property rights of the private citizen, should be swift to check such officers in the abuse of such discretion.

After all, however, it must be mainly a question of fact, whether or not a given culvert is temporary, in the sense of the charter.

It must be determined from all the surrounding facts and circumstances. It occurred to me, in reading

over the specifications and the testimony of the engineer, that this question of fact might have been placed in better form had the question been asked him directly, to state wherein the manner of construction and material of this culvert differed from that pursued and employed in the construction of a permanent culvert? For, I confess, had the cause been heard by me, I should have had some difficulty in escaping the impression that the character of this work was rather durable and substantial, as well as expensive, for a temporary purpose.

The evidence of this engineer, however, was, that he regarded the work, as done, essential to answer the purpose of a temporary culvert at that particular place, as, in his judgment, a less substantial structure would have been unavailing to meet the emergencies likely to come upon it before the construction of any sewer in that part of the city. And there was evidence of experts tending strongly to corroborate his opinion. While there was some countervailing proof, on the part of the plaintiffs, we cannot say, with confidence, that the conclusion reached by the trial judge was not borne out by the weight of the evidence. The special finding of the court is not, in so many words, that the culvert was a temporary work, in its mode of construction, yet it is in substance.

The finding is, "that the material used in the culvert was of a durable and substantial character, and that a culvert of the strength and durability of this one was necessary for the proper protection and construction of the whole work."

While, in a chancery proceeding, our judgment is not controlled, on appeal, by the conclusions drawn from the evidence by the trial judge, yet the tendency is more in the appellate courts, on disputed facts and opposing testimony, to defer much to the conclusions of the trial court. The trial judge hears all the evidence; he knows, generally, the witnesses; he observes their manner; and, from his vantage ground, has a better

insight into the very substance of the evidence. On this account, we defer much to his conclusions in a case like this. *Chapman v. McIlwrath*, 77 Mo. 43 ; *Hodges v. Black*, 76 Mo. 537 ; *Royle v. Jones*, 78 Mo. 403 ; *Judy v. Farmers', etc., Bank*, 81 Mo. 414; *Berberett v. City of Edina*, 19 Mo. App. 550.

Having reached the foregoing conclusion, it is, of course, unnecessary to consider the other question raised by appellant, whether the tax bills for the culvert, if invalid, and being indistinguishable from the valid portion of the tax, would not render the whole tax void.

It follows, the other judges concurring, that the judgment of the circuit court is affirmed.

## On motion for Re-hearing.

PER CURIAM.—I. It is insisted in the motion for re-hearing, by appellant, that the court erred in its opinion in holding that what would be a temporary culvert at one place might not be at another, for this, it is contended, substitutes the place where the culvert is put as the pivotal point in deciding its character, rather than from the materials or character of the work.

We can but reaffirm, on full consideration, that, from the very necessities of the case, the place where the culvert is built must have much to do with its materials as with its dimensions. At one point the volume of water likely to pass through the culvert may be very small. The descent may be so gradual as to make it run slowly, causing little pressure on the walls ; and the shortness of its length may be such as to afford quicker relief by the sudden escape of the water. At such a point the culvert may be so shallow that the pressure of loose and settling earth on and around it would be comparatively little. At such a point, a wooden culvert, or of brick with common mortar, simple and inexpensive, might well serve a temporary purpose. Whereas, at a point like the one in question, where the drain is one

hundred and fifty feet long, with wall four feet and five feet high, in order to accommodate the volume of water likely to be precipitated through it on occasions of freshets, that may come at any time before the city can construct more permanent work, would necessitate a more substantial quality of material and workmanship. At such a point, as shown by the evidence, a wooden or brick structure would likely be swept away by the first flood it encountered, to the complete ruin of the work done in grading, etc.

The argument of the learned counsel seems to wholly overlook the point made in the opinion, based on the provisions of the charter, that while the work authorized is only of a temporary character, its design and office is, to protect "the work done in constructing any street, etc., from surface water." If it fail to do that, it is not the temporary culvert intended and required by the law. Whatever is essential to protect the work done, even for a temporary purpose, is required by the charter to be done at the expense of the property owner.

It, therefore, must be mainly a question of fact in each particular case, whether or not the character of culvert constructed was essential to answer a temporary rather than a permanent end. Whatever is beyond the necessities of subserving a temporary purpose cannot be imposed as a tax on the private property owner.

II. It is next claimed, that in deferring, as the opinion does, somewhat to the conclusions of the trial judge, we overlooked the fact that his was a special finding, in which he did not say the culvert was temporary ; but, on the contrary, the special facts found rather indicate that the work was of a permanent character.

The opinion does give special attention to the language of the finding. While the finding was, that the work was of a durable and substantial character, the more special finding is, "that a culvert of the strength

and durability of this one *was necessary for the proper protection* of the whole work."

As the matter of contention at the trial was, whether this culvert was a temporary or permanent one, in its character, the language of the finding must be understood and interpreted with reference to such issue. So, while the court found that the material used was durable and substantial, it found the further fact, that the employment of such material *was necessary for the proper protection* of the work.

And, while we felt that a different conclusion might well have been reached by the trier of the fact, we did not, and do not, feel that the opposite view is of such persuasive force as to justify us, against the better opportunities of the *nisi* judge, in otherwise determining the weight of evidence.

III. No question was raised at the trial, on the introduction of the general ordinance of the city in evidence, nor in the brief of counsel on this appeal, as to whether this work should have been provided for by a special ordinance, prescribing the character of material, etc. That question, therefore, has not been considered by us.

The motion for re-hearing is denied.